# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN DALE BELL,<br><br>Petitioner,<br><br>v.<br><br>JAMES HARTLEY, Warden<br><br>Respondent.<br>_____________________________/ | 1:10-cv-00109-OWW-DLB (HC)<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>[Doc. 1] |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

BACKGROUND[1]

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation (CDCR) following his 1995 attempted murder conviction. He is serving a sentence of seven-years-to-life, plus four years for various enhancements.

In the instant petition, Petitioner does not challenge the validity of his conviction; rather, he challenges the November 6, 2008 decision by the Board of Parole Hearings (Board) finding him unsuitable for release.

///

///

[1] This information is derived from the state court documents attached to Respondent's answer to the petition, which are not subject to dispute.

In May 2009, Petitioner filed a petition for writ of habeas corpus in the Santa Clara County Superior Court claiming that the 2008 Board decision was not supported by some evidence of current dangerousness. The superior court denied the petition in a reasoned decision.

Petitioner raised the same claims to the California Court of Appeal and California Supreme Court by way of habeas corpus petitions, both were summarily denied.

Petitioner filed the instant federal petition for writ of habeas corpus on January 22, 2010. Respondent filed an answer to the petition on April 2, 2010, and Petitioner filed a traverse on May 3, 2010.

On June 7, 2010, the Court granted Respondent's request to submit supplemental briefing in light of the Ninth Circuit Court of Appeals' decision in Hayward v. Marshall, 603 F.3d 546, 559-661 (9th Cir. 2010), and the supplemental brief was filed on July 7, 2010. On July 19, 2010, Petitioner filed a request to oppose Respondent's supplemental brief, along with the opposition. Petitioner's request is hereby granted.

STATEMENT OF FACTS

In May of 1993, Petitioner married Cathy (the victim in this case) and each of them had two children from prior marriage that resided in their family home. In August of 1993, Petitioner became in contact with Susan, a former girlfriend, and with Cathy's approval the two of them exchanged occasional letters and telephone calls.

However, unbeknownst to Cathy, the two became involved in a clandestine sexual relationship consummated at various locations within the United States. Petitioner disguised the meetings with Sue by claiming to be on business trips and even prepared false travel documents to conceal the true purpose of the trips. Petitioner arranged the meetings through numerous telephone calls to Susan but was able to conceal the phone calls because he paid all the telephone bills.

In early August, Cathy happened to open and examine a telephone bill that arrived in the mail. She discovered that numerous phone calls had been placed to Chino, and she asked Petitioner who lived there. Petitioner acknowledged it was Sue and claimed that he was

///

providing her emotional support as she was going through a divorce. Cathy was upset and stated that she would continue to monitor his telephone calls.

Approximately two weeks before the commitment offense, Petitioner made plans to spend the night of August 9 with Sue in San Francisco, and disguised the trip by claiming to be on a business trip in Sacramento. He gave Cathy the telephone number of the hotel in which, he said, he would be staying in Sacramento. On August 9, he went to Sacramento and checked into the hotel. He then proceeded as planned to San Francisco to meet Susan. During the evening, Cathy called the Sacramento hotel, and when Petitioner did not answer the phone in the room she called his pager number. Petitioner returned the page from a theater lobby during intermission of the show he was watching with Susan. He explained the noise by claiming he had gone to a Sacramento brew pub for drinks and dinner. He also returned another page and claimed he had just returned to his hotel room.

When Petitioner returned home the next day, he initially appeared cold but he and Cathy had sexual intercourse twice two days later. Cathy's brother who stayed the night the following day, a Saturday, also testified that the interactions between Petitioner and Cathy were good and it was a pleasant evening.

All of the children were out of the home on Sunday night, and at bed time Petitioner gave Cathy a sentimental card and a wrapped recording of the soundtrack from the movie, "Forrest Gump." Cathy commented that Petitioner need not purchase things as a gift for her that he wanted to buy for himself. Petitioner and Cathy then argued, and after a brief cooling off period, they apologized to one another.

The next morning, Cathy asked Petitioner to shower first because she was still tired. Petitioner awakened Cathy shortly thereafter by kissing her on the cheek. When she got out of bed Petitioner asked her to sit down on the bed and close her eyes because he had another present for her. She sat down and closed her eyes. She then heard rustling which seemed to come from the closet.

Cathy sensed nothing further until she discovered herself on her back on the floor with a plastic bag stretched tightly over her face. She felt like she was dying. She felt hands holding

onto the plastic bag and struggled to remove the hands. The bag was finally removed and she saw Petitioner standing over her.

Petitioner claimed that she had hurt herself and suggested she take a shower to wash off the blood. Cathy discovered she was bleeding from a cut on the back of her head. She got into the shower and when she turned the water on, it made her feel dizzy and sick so she immediately got out and walked back to the bedroom.

When she was in the bedroom, she saw a club-like device made out of pieces of metal pipe. She had never seen the device before, and she then concluded that Petitioner had tried to kill her. She asked Petitioner to call for help and began to scream. Petitioner ultimately called 911 and police and paramedics responded.

Cathy was taken to the hospital. Based on the description of the incident, the police arrested Petitioner and removed him from the home. During a search, officers discovered the pipe device and the plastic bag. Blood was found on the pipe and the bag was tested for DNA.

It was determinated that Cathy suffered a blunt-instrument wound to the back of her head which requires sutures to close. She was treated and released from the hospital on the same day. However, she continued to experience ongoing neurological symptoms.

Later that same day, police made contact with Sue who admitted she had sexual relations with Petitioner. The next day police told Cathy about Petitioner's relationship with Sue, and this was the first she had heard of the nature of their relationship.

## DISCUSSION

### I. Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).

The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging [her] underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71;Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th

Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

II. Review of Petition

There is no independent right to parole under the United States Constitution; rather, the right exists and is created by the substantive state law which defines the parole scheme. Hayward v. Marshall, 603 F.3d 546, 559, 561 (9th Cir. 2010) (en banc) (citing Bd. of Pardons v. Allen, 482 U.S. 369, 371 (1987); Pearson v. Muntz, No. 08-55728, 2010 WL 2108964, * 2 (9th Cir. May 24, 2010) (citing Wilkinson v. Austin, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005)); Cooke v. Solis, No. 06-15444, 2010 WL 2330283, *6 (9th Cir. June 4, 2010). "[D]espite the necessarily subjective and predictive nature of the parole-release decision, state statutes may create liberty interests in parole release that are entitled to protection under the Due Process Clause." Bd. of Pardons v. Allen, 482 U.S. at 371.

In California, the Board of Parole Hearings' determination of whether an inmate is suitable for parole is controlled by the following regulations:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

Cal. Code Regs. tit. 15, §§ 2402(a) and (b). Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for release. "Circumstances tending to indicate unsuitability include:

> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
> (A) Multiple victims were attacked, injured or killed in the same or separate

incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.'

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Cal. Code Regs. tit. 15, § 2402(c)(1)(A)-(E),(2)-(9).

Section 2402(d) sets forth the circumstances tending to show suitability which include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

> (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

Cal. Code Regs. tit. 15, § 2402(d)(1)-(9)

The California parole scheme entitles the prisoner to a parole hearing and various procedural guarantees and rights before, at, and after the hearing. Cal. Penal Code § 3041.5. If denied parole, the prisoner is entitled to subsequent hearings at intervals set by statute. Id. In addition, if the Board or Governor find the prisoner unsuitable for release, the prisoner is entitled to a written explanation. Cal. Penal Code §§ 3041.2, 3041.5. The denial of parole must also be supported by "some evidence," but review of the Board's or Governor's decision is extremely deferential. In re Rosenkrantz, 29 Cal.4th 616, 128 Cal.Rptr.3d 104, 59 P.3d 174, 210 (2002).

Because California's statutory parole scheme guarantees that prisoners will not be denied parole absent some evidence of present dangerousness, the Ninth Circuit Court of Appeals recently held California law creates a liberty interest in parole that may be enforced under the Due Process Clause. Hayward v. Marshall, 602 F.3d at 561-563; Pearson v. Muntz, 606 F.3d 606, 608-609 (9th Cir. 2010). Therefore, under 28 U.S.C. § 2254, this Court's ultimate determination is whether the state court's application of the some evidence rule was unreasonable or was based on an unreasonable determination of the facts in light of the evidence. Hayward v. Marshall. 603 F.3d at 563; Pearson v. Muntz, 606 F.3d at 608.

The applicable California standard "is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." In re Lawrence, 44 Cal.4th 1181, 1212 (2008) (emphasis in original and citations omitted). As to the circumstances of the commitment offense, the Lawrence Court concluded that

> although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

Id. at 1214.

In addition, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prison remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." In re Lawrence, 44 Cal.4th at 1212.

"In sum, a reviewing court must consider 'whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor.'" Cooke v. Solis, 606 F.3d 1206, 1214 (9th Cir. 2010) (emphasis in original) (citing Hayward v. Marshall, 603 F.3d at 560).

A. Last Reasoned State Court Decision

The Santa Clara County Superior Court provided the last reasoned decision and denied the petition stating, in pertinent part:

> November 6, 2008 the Parole Board ("the Board") denied petitioners request for parole. The Board relied extensively on Petitioner's lack of insight into his crime as a basis for concluding that he would pose a current risk to public safety if released into the community. On November 6, 2008 Petitioner, as was his right, refused to make any statement to the Board regarding the crime. The [B]oard relied on Petitioner's statements in the past regarding his crime, including petitioner's statement at sentencing where he stated, "I did not attack my wife." The [B]oard also relied on Petitioner's demeanor at the hearing; noting petitioner was emotionless and disingenuous. The Board also noted that Petitioner appeared very controlled in everything he said. Based on Petitioner's past statements, and current demeanor (where the Board essentially made a finding of fact that they disbelieved Petitioner's claim of remorse), the Board concluded that Petitioner's lack of insight regarding his life crime made him a current risk to public safety. The rationale of such a finding is obvious: a person who denies committing a crime, that they plainly committed, lacks insight into the factors that led to the commission of the crime, thus increasing the risk of a repeat offense.
>
> Petitioner claims that the Board that the Board improperly used his refusal to discuss his life crime against him, in violation of Title 15 CCR section 2236. Petitioner is mistaken. The Board relied on Petitioner's past statements and current demeanor. Nothing in the record indicates that the petitioners refusal to discuss his life crime was "held against" him.
>
> The Board's reliance o[n] Petitioner's past and present attitude about the crime is appropriate and constitutes some evidence that Petitioner poses a current risk to public safety if released. In re Shaputis, 44 Cal.4th 1241(2008). Petitioner strenuously denies the conclusions made by the Board and cites evidence

> presented that he argues leads to a contrary conclusion. That, however, is irrelevant. The Court will not re-weigh evidence presented nor substitute its judgment of the evidence presented at the hearing for that of the Board[].

(Answer, Ex. 2.)

B. 2008 Board Hearing

At Petitioner's parole consideration hearing on November 6, 2008, the Board found him unsuitable based on the circumstances of the commitment offense, lack of insight, and present demeanor.

The commitment offense was "exceptionally calculated" which involved Petitioner luring his wife into a ruse and then striking her in the back of the head with a metal pipe and attempting to suffocate her with a plastic bag held tightly over her head. Petitioner methodically planned how the offense would occur and construed the metal pipe he used to strike his wife. The attempted murder was the culmination of several months of Petitioner's extramarital affair which admittedly caused him an enormous amount of pressure and anxiety. At the time of the offense, Petitioner had been recently confronted by his wife regarding his relationship with Sue. The victim was extremely vulnerable as she was Petitioner's wife and most certainly trusted him. Petitioner denied the offense and attempted to place the blame on the victim claiming that she injured herself. Based on these circumstances, the crime was certainly very callous and calculated.

At the 2008 hearing, Petitioner continued to minimize his involvement in the offense claiming that he did not attempt to kill his wife. Petitioner spoke mainly to his responsibility for the affair with Sue but failed to accept true responsibility for the commitment offense. The Board pointed to a November 26, 2007 letter (written just one year prior to the instant hearing), in which Petitioner wrote:

> As you know, throughout that summer, I became moodier at home, more negative and complaining, easier to anger. I became more distant from you, less intimate in every way. You and I argued more, and these arguments were more hurtful, bringing out a rashness in me an irrationalism that I'd not suspected I possessed. Instead of addressing this, I avoided it, denying it even as I found excuses to stay away from home, to work longer and visit distance [sic] Kaiser

> locations when I really didn't need to (although only six of these trips were affair-related). My frustration, guilt, turmoil, and stress continued to build. I had put myself into an emotional trap, and I saw no way out."

Petitioner himself admitted he committed the offense because he felt there was no other way out of the situation he had himself created. Petitioner exercised his right not to speak about the commitment offense, so the Board had not choice but to rely on the only evidence before it from the sentencing transcript in which Petitioner flatly denied attacking his wife.

The Board found that Petitioner presented himself as very self-absorbed and emotionless, and continued to take responsibility for the affair but not the commitment offense. Petitioner appeared very controlled and avoided answering many of the Board's questions directly. For example, when the Presiding Commissioner asked Petitioner what he would have done differently on the day of the commitment offense, he responded, "I would not have gotten involved with a woman who was not my wife." He claimed the commitment offense would not have occurred but for the affair. Petitioner never once explained why he desired to kill his wife instead of simply filing for divorce or separation. The commitment offense was obviously calculated as Petitioner created the pipe and instructed his wife to close her eyes because he had another gift for her (which was the attack with a pipe). Yet, Petitioner never explains how or why he planned the attack in the manner he did. Without information to determine whether Petitioner understood the causative factors of the commitment offense, some evidence supports the finding that he lacked sufficient insight into the offense and remained an unreasonable risk to public safety. The superior court properly reasoned "[t]he rationale of such a finding is obvious: a person who denies committing a crime, that they plainly committed, lacks insight into the factors that led to the commission of the crime, thus increasing the risk of a repeat offense." (Answer, Ex. 2.)

After considering and commending Petitioner on the factors in support of suitability, the Board concluded that "nothing that we have read or heard shows that ... you have any acknowledgment or responsibility for the fact that you tried to murder [Cathy]. And until the Panel understands that you understand why you chose to do what you did that day, we don't have any feeling that you won't do it again when faced with similar circumstances." (Pet. Ex. A,

Board's Tr. at 115.) Petitioner was unable to articulate what triggered his anger and violent actions on the day of the commitment offense and was completely unresponsive in this respect. This Court cannot re-weigh the Board's determinations, it can only determine if the cited factors provide some evidence to support the finding that he remains an unreasonable risk to public safety. The superior court reasonably determined that, notwithstanding the positive factors from Petitioner's good behavior in prison, the evidence of Petitioner's dangerous behavior during the commitment offense, coupled with his lack of insight into the crime and demeanor during the 2008 hearing provided a sufficient "nexus" between his past dangerous behavior and the current unreasonable risk of danger if released. Accordingly, the state courts' determination of this issue was not contrary to or an unreasonable application of the some evidence standard, nor an unreasonable determination of the facts in light of the evidence.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and

2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated: July 22, 2010** **/s/ Dennis L. Beck**
UNITED STATES MAGISTRATE JUDGE